# Case No. 646.

## The AUGUSTA.

### SMITH v. The AUGUSTA.

[2 Adm. Rec. 273.]

Superior Court, S. D. Florida. May 29, 1839.

# Case No. 647.

## The AUGUSTA.

[5 Amer. Law T. Rep. 495.]

District Court, D. Oregon. Nov., 1872.

MARITIME LIENS—LIBEL FOR REPAIRS—MATERIALMEN.

[1. A person who puts work and materials into the ship of another as a mere trespasser or intruder does not thereby become a materialman, and entitled to a lien; and a libel by employes of a contractor against a vessel and her owners which fails to allege that the contractor had authority to make the repairs or employ the libellants thereon is insufficient.]

[Cited in The City of Salem, 10 Fed. 846.]

[2. The effect of admiralty rule 12, as amended in 1872, is to make all ships, domestic as well as foreign, liable for repairs, supplies, or other necessaries furnished at the express or implied request of the owner or master, whether in home ports or not.]

[Cited in Whittaker v. The J. A. Travis, Case No. 17,599.]

[See note at end of case.]

[3. Ship-carpenters employed to repair a vessel by a person contracting with the owners for that purpose, without notice that they must look to the contractor for payment, work with the implied consent of the owners, and have a lien for their wages, unless the dealings of the parties show that an exclusively personal credit was given to the master or owners.]

[In admiralty. Libel against the brig Augusta, and James Terwilliger and Walter Moffet, her owners, by D. McLeod and 14 others, employes of John Rutter, for work done in repairing the brig. Held insufficient, because an allegation that John Rutter was authorized to make the repairs was lacking. Heard on the amended libel against the vessel alone. Decree for libellants.]

DEADY, District Judge. On September 7, 1872, D. McLeod and fourteen others brought suit against the brig Augusta and her owners, James Terwilliger and Walter Moffet, to recover certain sums of money alleged to be due the libellants respectively, which in the aggregate amounted to $942.42, for work and labor, as ship-carpenters, done on said vessel in July, 1872, at the request of John Rutter; and that said work was done by libellants upon the credit of said vessel as well as upon that of the said owners. On September 24 the respondents excepted to the libel for various causes, and upon the argument thereof, on October 12, the libel was held to be insufficient, because it did not appear therefrom but that said Rutter was an intruder upon said vessel, and without au-

thority to repair the same or employ libellants to work thereon. Leave being granted, the libellants on October 14 filed an amended libel against the vessel alone, alleging as above, and also that said libellants did said work and labor with the knowledge and approbation of said owners; and that said Rutter was duly authorized by said owners to make certain changes and repairs on said vessel, and employ libellants thereon; and that said libellants relied upon "the lien on said vessel, which would accrue to them, for doing said work, and upon the credit of the owners, and not upon the credit of said Rutter." On October 19 the owners answered the libel, admitting that the libellants did work and labor upon said vessel, but denying all knowledge of the time so occupied by them, or that libellants did said work with the knowledge and approval of respondents, or that said Rutter was the agent of respondents, or authorized to employ libellants upon the credit of the vessel or that of the owners thereof; and alleging that on May 31, 1872, respondent, Moffet, made a contract with said Rutter to make certain alterations and repairs in and upon said vessel for a certain price, said Rutter thereby agreeing to furnish all the materials and labor necessary to comply with said contract; and that said Rutter afterwards performed said contract, and was fully paid therefor before the commencement of this suit; and that if said libellants did work upon said vessel, it was as the employes of said Rutter, and not otherwise.

On November 6 the cause was heard and submitted.

It also appeared from the pleadings and evidence that said alterations and repairs were made upon the Augusta at her home port, where her owners reside—the port of Portland—and that she is engaged in trade between that port and the Sandwich islands; and that respondents did not employ libellants, but that the work was done by contract with said Rutter, as alleged in the answer herein, for the sum of $1,350, and that libellants did the work aforesaid at the request of said Rutter, and the value and quantity thereof are truly stated in the schedule to the libel herein; and that libellants did not demand said money of respondents until after Rutter left the country. Have the libellants, under the circumstances, a lien upon the vessel for their work done upon her?

The judicial power of the United States extends "to all cases of admiralty and maritime jurisdiction." Const. U. S. art. 3, § 2. Of course what are cases of admiralty and maritime jurisdiction must finally be determined by the supreme court. The question involves the construction and interpretation to be given to the constitution of the United States. Neither congress nor the states can increase or diminish the jurisdiction.

By section 6 of the act of August 23, 1842, (5 Stat. 517,) congress, among other things, authorized the supreme court to prescribe and regulate the form and modes of proceedings in admiralty. In pursuance of this authority and in accordance with the undoubted jurisdiction exercised by the district courts from the formation of the government, and affirmed by the supreme court in The General Smith, (1819) 4 Wheat. [17 U. S.] 438; The Planter, (1833,) 7 Pet. [32 U. S.] 324; The Orleans, (1837,) 11 Pet. [36 U. S.] 175,—that where a local law attaches a lien to a maritime service, as for repairs furnished a vessel engaged in maritime commerce, a suit in admiralty lies to enforce it, the supreme court in 1844, in revising the admiralty rules, prescribed in effect, by rule 12, that where by the local law a lien is given to materialmen for supplies, repairs or other necessaries furnished a domestic ship, they may proceed in admiralty to enforce such lien, as in the case of a foreign ship. In 1859 the supreme court amended this rule, so as to confine the remedy of materialmen in cases of domestic ships to a suit in personam—thus, in effect, prohibiting the enforcement of a lien in such cases, if any existed. Professedly, the rule as amended in 1859 only regulated "the character of the process to be used" in such cases, and did not touch the right; for a right in rem, without proceedings in rem to enforce it, is practically no right at all. For the same reason the rule, in effect, changed the law, and excluded such cases from the jurisdiction of the district courts. After thirteen years of unfavorable experience under the amendment of 1859, and many unsatisfactory attempts to account for the reason or existence of it, the supreme court, in May, 1872, amended the rule, so as to make it read as follows: "In all suits by materialmen for supplies, or repairs, or other necessaries, the libellant may proceed against the ship and freight in rem, or against the master or owner alone in personam."

I think the effect of the rule in its present form is to do away with the distinction which prevailed after the decision in the case of The General Smith, supra, between foreign and domestic ships and ships in home or other ports, and to make all ships, as such, liable for repairs, supplies, or other necessaries, furnished at the express or implied request of the owner or master. Ben. Adm. § 272, says: "The civil law, and the general maritime law, and the particular maritime codes, without exception, extend this lien or privilege to all ships and vessels, without any distinction between foreign and domestic ships. Indeed, it is not easy to see how any difference can exist in principle; if one is a ship or vessel, so is the other; and the same law and the same reason which gives a lien in the one case gives it in the other. It is for service, labor, materials, and supplies furnished to the ship,

and in some sort made a part of her, for her benefit, and the lien attaches to her." After stating the fact of the distinction made between foreign and domestic ships in the case of The General Smith, supra, the same author (Id. § 272) goes on to say: "It is, however, believed that whenever the question shall come before the supreme court, and be fully considered by that court after argument, the distinction between foreign and domestic vessels will be found to be no part of the law of admiralty. The mere residence of the owner would seem to have even less relation to maritime subject-matter than the pretexts of the time of Lord Coke." In a learned note to The Harrison, [Case No. 5,038,] Mr. Justice Hoffman concludes: "It is thus evident that by the principles and analogies of the maritime law, and the 'good customs of the sea,' ('les bonnes coutumes de la mer,' as they are called in the Consolato,) and on grounds of equity and natural justice, the lien of the materialman who has constructed, repaired, or supplied a vessel, ought to be recognized and enforced as a maritime lien by courts of admiralty. And this whether the work has been done in a port of the state in which the owner resides or elsewhere; and whether upon the employment of the master or of the owner, or of his agent—excepting in those cases where the lien has been clearly waived, or 'notice has been given to the workmen and other materialmen, in order that they may not be deceived.'" In the adoption and promulgation of rule 12, (1872,) without noticing or providing for any distinction between foreign and domestic ships and home or other ports, as in the rules of 1844 and 1859, it must be presumed that the supreme court considered this question, and concluded that the distinction was "no part of the law of the admiralty." In accordance with these premises, I conclude that the rule on the subject of liens in favor of materialmen has finally rested where it always should, upon the general maritime law, as administered even in England before it was there restrained by the courts of the common law in the time of Charles II.

If, then, the libellants are materialmen within the signification of that term as used in rule 12, they have a lien, and are entitled to maintain this suit to enforce it. Indeed, upon the argument, it was tacitly conceded by counsel for respondents that the case was narrowed down to the inquiry, are the libellants materialmen or not? No reason has been given, and none occurs to my mind, why the term materialmen should be used in the rule in another or more limited sense than in the general maritime law, from which it is taken. Benedict says: "Those are called materialmen who, at the time of the building of a vessel, or during her subsequent existence as a vessel, supply her, at the express or implied request of the master or owner, with necessary materials to build, fit, outfit, furnish, or repair." Ben. Adm. § 267. Parsons says: "The persons employed to repair a ship, or, in general, to do any work about her, and those who furnish for her use supplies of things necessary to her equipment and safe navigation, are known in the law of shipping as materialmen." 1 Pars. Shipp. & Adm. 141. In The Neptune, 3 Hagg. Adm. 129, 142, Lord Stowell cites a report made by that learned judge, Leoline Jenkins, to the king, in which he says: "Those are commonly called materialmen whose trade it is to build, repair, or equip ships, or to furnish them with tackle and provisions necessary in any kind." But it is insisted that libellants did not work on this vessel at the request of respondents; that there is no privity of contract between them and the latter; and therefore the law allows them no lien, and they must look to the contractor, Rutter, who employed them, for their compensation.

As at present advised, I think the libellants could not make the respondents their debtors and acquire a lien upon the vessel therefor, without the consent of the latter, either expressed or implied. Ben. Adm. § 267. A person who puts work or materials into the ship of another, as a mere trespasser or intruder, does not thereby become a materialman, and entitled to a lien thereon for the value of such work or materials; and so this court ruled upon the exception to the original libel herein. But the consent of the owner may be implied from the circumstances of the case. For instance, when the respondent contracted with Rutter to repair the vessel, it was necessarily implied that he might employ libellants, and they might be so employed to work thereon. They are therefore not intruders on or strangers to this vessel, but persons employed to work thereon with the implied consent of the owners. This conclusion is in accordance with general principles of law. The owner of any structure or premises impliedly consents that a person with whom he contracts to do work thereon may use any lawful and convenient means to perform his contract; and the employment of the libellants in this case seems to be within this rule or general principle. And upon authority it appears clear that, according to the general maritime law, where an owner makes a contract with another to build, repair, or supply a vessel, those who work thereon at the request of the contractor do so with the implied consent of the owner, and are entitled to a lien thereon for the value of their labor "unless the dealings of the parties show that an exclusive personal credit was given to the master or owners," or unless they have notice that they must rely upon the contractor for payment. Ben. Adm. § 267; 2 Pars. Shipp. & Adm. 322. Emerigon, in his Commentary on the Consolato del Mare, as cited by Mr. Justice Hoffman in his note to The Harrison, observes: "The carpenters, caulkers, and other workmen em-

ployed in building, together with the creditors for the timber, cordage, and other articles furnished, ought to enjoy the privilege allowed to them, unless they have been warned in due time that if they do not secure the payment of their claims against the contractor they shall have no lien on the ship." In this case it is not claimed that the libellants had notice in any manner that they must look to the contractor for the payment of their wages, and they are entitled to a lien therefor.

This being so, it is unnecessary to consider whether upon the evidence the libellants or any of them and respondents understood from the first that the former would rely upon the vessel as security for their wages. Rutter gave bonds with security in the sum of $2,500 for the faithful performance of his contract. Duncan Ferguson, one of the libellants, swears that before he was employed Moffet asked him if he was going to work on the vessel. Witness asked M. about the pay. Moffet replied that vessel was good for it, that Rutter had a contract to do the work, and he, M., had a bond for twice the amount of work. It does not appear directly from the evidence, but it is probable that Rutter, about the completion of the contract, absconded. Moffet states that the men did not demand their wages of him until after Rutter "left," and that he did not remember the conversation with Ferguson.

A decree will be given for the libellants for the amounts severally claimed by them.

[NOTE. The doctrines laid down in this case touching the existence under admiralty rule 12, and, in the absence of state legislation, of a maritime lien for repairs and supplies furnished in the home port, were distinctly overruled in The Lottawanna, 21 Wall. (88 U. S.) 558, (decided in 1875.) In that case a libel for repairs and supplies furnished in the home port was filed in the district court for the district of Louisiana. Certain mortgagees intervened, and, by the decree of the district court, their claims were given precedence over those of the repair and supply men. On appeal the circuit court decreed the latter's claim superior to the mortgage, on the ground that they had a maritime lien. The amendment to admiralty rule 12, on which the decision in the principal case rests, was urged in argument. The decree of the circuit court was reversed. Mr. Justice Bradley, in delivering the opinion, said: "The principal question presented by the appeal, therefore, is whether the furnishing to a vessel on her credit, at her home port, needful repairs and supplies, creates a maritime lien. * * * This very question was decided by this court adversely to the lien more than fifty years ago, in the case of The General Smith, reported in 4 Wheat. (17 U. S.) 438, and that decision has ever since been adhered to, except occasionally in some of the district courts. A solemn judgment relied on so long by the commercial community as a rule of property and the law of the land ought not to be overruled except for very cogent reasons. If, however, in the progress of investigation, and with the new lights that have been thrown upon the whole subject of maritime law and admiralty jurisdiction, a more rational view of the question demands an adverse ruling in order to preserve harmony and logical consistency in the general system, the court might, perhaps, if no evil consequences of a glaring character were likely to ensue, feel constrained to adopt it. But, if no such necessity exists, we ought not to permit any consideration of mere expediency or love of scientific completeness to draw us into a substantial change of the received law. * * * The ground on which we are asked to overrule the judgment in the case of The General Smith, supra, is that, by the general maritime law, those who furnish necessary materials, repairs, and supplies to a vessel, upon her credit, have a lien on such a vessel therefor, as well when furnished in her home port as when furnished in a foreign port, and that courts of admiralty are bound to give effect to that lien. The proposition assumes that the general maritime law governs this case, and is binding on the courts of the United States. But it is hardly necessary to argue that the maritime law is only so far operative as law in any country as it is adopted by the laws and usages of that country. * * * The proposition, therefore, that, by the general maritime law, a lien is given in cases of the kind now under consideration, does not advance the argument a single step, unless it be shown to be in accordance with the maritime law, as accepted and received in the United States. It certainly has not been the maritime law of England for more than two centuries past; and whether it is the maritime law of this country depends upon questions which are not answered by simply turning to the ordinary European treaties on maritime law, or the codes or ordinances of any particular country. * * * And, according to the maritime law as accepted and received in this country, we feel bound to declare that no such lien exists as is claimed by the appellees in this case. The adjudications of this court before referred to, which it is unnecessary to review, are conclusive on the subject; and we see no sufficient ground for disturbing them." Mr. Justice Clifford dissented.

[Other authorities to the same effect are The Rapid Transit, 11 Fed. 322; Stephenson v. The Francis, 21 Fed. 715, (where it was held that, in the case of several equal co-owners residing in different states, no lien will arise for supplies furnished in the state of the known residence of either;) The Thomas Fletcher, 24 Fed. 375; The Mary Morgan, 28 Fed. 196; The Pirate, 32 Fed. 486; The Samuel Marshall, 49 Fed. 754.]